OHIO DOMESTIC VIOLENCE NETWORK ET AL., APPELLANTS, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Domestic Violence Network v. Pub.
Util. Comm.* (1994), 70 Ohio St.3d 311.]

(Nos. 93–1050, 93–1453, 93–1515 and 93–1516—Submitted
April 26, 1994—Decided September 21, 1994.)

312

314

*Hahn Loeser & Parks, Janine L. Migden, Maureen R. Grady, Randy J. Hart* and *Patricia A. Nussle;* and *Kathryn Bamberger,* for appellant in case No. 93–1050, Ohio Domestic Violence Network.

*Robert S. Tongren,* Consumers' Counsel, *Werner L. Margard III, David C. Bergmann* and *Yvonne T. Ranft,* Associate Consumers' Counsel, for appellant in case Nos. 93–1453, 93–1515 and 93–1516, Office of Consumers' Counsel.

*Lee Fisher,* Attorney General, *James B. Gainer, Anne E. Henkener* and *Steven T. Nourse,* Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

*William H. Hunt, Charles S. Rawlings* and *Jon F. Kelly,* for intervening appellee Ohio Bell Telephone Company.

*Per Curiam.* For the following reasons, we affirm the orders of the commission.

# I

## STANDING

As a threshold matter, we must consider whether, having been denied intervention in the 1992 and 1993 cases, appellants have standing to appeal the commission's orders authorizing Ohio Bell to offer the CLASS services. R.C. 4903.13 requires a person to have been a party in commission proceedings to appeal a commission order. See *Communications Workers of Am. v. Pub. Util. Comm.* (1979), 57 Ohio St.2d 76, 11 O.O.3d 244, 387 N.E.2d 230, and *Harrison v. Pub. Util. Comm.* (1938), 134 Ohio St. 346, 12 O.O. 316, 16 N.E.2d 943.

Appellants argue that the commission was compelled to grant them intervention under R.C. 4903.221.[2] That statute, however, clearly contemplates intervention in quasi-judicial proceedings, characterized by notice, hearing, and the making of an evidentiary record. Since the commission did not exercise its discretion to hold a hearing on applications for new services under R.C. 4909.18, there is no right to intervene. Intervention in such circumstances would defeat the General Assembly's apparent intent that new services, which in the discretion of the commission appear to be just and reasonable, be offered to the public without regulatory delay. Under R.C. Title 49, an aggrieved person's recourse is through the complaint procedure provided in R.C. 4905.26. *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1969), 17 Ohio St.2d 45, 48, 46 O.O.2d 264, 266, 245 N.E.2d 351, 353. We find that, having never been made a party to the proceeding in which the commission considered and approved Call Screening and Distinctive Ringing, OCC is without standing to appeal that order to this court. Accordingly, we dismiss OCC's appeal in case No. 93-1515.

---

2. R.C. 4903.221 provides:

"Any other person who may be adversely affected by a public utilities commission proceeding may intervene in such proceeding, provided:

"(A) That such other person files a motion to intervene with the commission no later than:

"(1) Any specific deadline established by order of the commission for purposes of a particular proceeding; or, if no such deadline is established;

"(2) Five days prior to the scheduled date of hearing.

"The public utilities commission may, in its discretion, grant motions to intervene which are filed after the deadlines set forth in divisions (A)(1) and (2) of this section for good cause shown.

"(B) That the commission, in ruling upon applications to intervene in its proceedings, shall consider the following criteria:

"(1) The nature and extent of the prospective intervenor's interest;

"(2) The legal position advanced by the prospective intervenor and its probable relation to the merits of the case;

"(3) Whether the intervention by the prospective intervenor will unduly prolong or delay the proceedings;

"(4) Whether the prospective intervenor will significantly contribute to full development and equitable resolution of the factual issues."

However, we reach a different conclusion as to the commission's orders approving Caller ID and Automatic Callback. As stated above, the commission adopted the record made in the 1991 proceeding, to which appellants were made parties, and used it as the basis to address appellants' objections in the instant case and, ultimately, to approve the services in the 1992 and 1993 orders. We find that, by its actions, the commission effectively consolidated the two proceedings, that appellants should be deemed parties to the 1992 and 1993 orders, and that they have standing to appeal the orders approving Caller ID and Automatic Callback.

II

*CONSTITUTIONAL CLAIMS*

A

*State Action*

Appellants argue that the CLASS services violate privacy rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution. Because these constitutional provisions protect individuals against deprivation of rights by the state, we must first determine whether the commission's approval of the services is sufficient to constitute "state action" under the Fourteenth Amendment, which incorporates and applies to the states the First and Fourth Amendments. *Griswold v. Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; *Jackson v. Metro. Edison Co.* (1974), 419 U.S. 345, 349–350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 483. See, also, *Moose Lodge No. 107 v. Irvis* (1972), 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627, 639–640.

Appellants rely on *Pub. Util. Comm. of D.C. v. Pollak* (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, for the proposition that the commission's election to hold a formal hearing on Ohio Bell's applications and its subsequent approval of the CLASS offerings provides the requisite nexus for state action. We disagree.

In *Jackson v. Metro. Edison Co., supra,* the Supreme Court questioned the *Pollak* decision, stating that it was unclear whether state action had actually been found or merely assumed for purposes of the constitutional analysis. 419 U.S. at 356, 95 S.Ct. at 456, 42 L.Ed.2d at 487. Refusing to find state action where a utility had terminated service for nonpayment pursuant to a tariff approved by the Pennsylvania Public Utility Commission, the court stated:

"The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such

a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice *by ordering it,* does not transmute a practice initiated by the utility and approved by the commission into 'state action.' At most the Commission's failure to overturn this practice amounts to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondents' exercise of the choice allowed by state law where the initiative comes from it and not from the State [footnote omitted], does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Id.* at 357, 95 S.Ct. at 456–457, 42 L.Ed.2d at 487.

The Supreme Court and lower courts have since construed *Jackson's* state action analysis as focusing upon whether the government could be held "responsible" for the private conduct; here, the offering of the CLASS services and the resulting alleged privacy intrusions. See *Blum v. Yaretsky* (1982), 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534, for the proposition that the state action requirement "assure[s] that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains [emphasis *sic* ]," *id.* at 1004, 102 S.Ct. at 2786, 73 L.Ed.2d at 546, and citing *Jackson* for the proposition that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. * * * Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the state responsible for those initiatives under the Fourteenth Amendment." *Id.,* 457 U.S. at 1004–1005, 102 S.Ct. at 2786, 73 L.Ed.2d at 546–547. Accord *Rendell– Baker v. Kohn* (1982), 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418.

Citing *Blum,* lower courts have refused to find state action under statutes similar to R.C. 4909.18, considering the hearing as part of a standard regulatory approval process under which the state does not initiate and is not deemed responsible for the implementation of new tariff offerings. *Carlin Communication, Inc. v. S. Bell Tel. & Tel. Co.* (C.A.11, 1986), 802 F.2d 1352 (upholding tariff restrictions on "900" service offerings); *S. Bell Tel. & Tel. Co. v. Hamm* (1991), 306 S.C. 70, 409 S.E.2d 775 (upholding approval of Caller ID).

Similarly, we do not find that the commission's approval of the CLASS services under the standard regulatory process provided by R.C. 4909.18 is sufficient to constitute state action. The commission did not order Ohio Bell to implement the CLASS offerings; that decision was initiated by and remained with the company throughout these lengthy proceedings. Indeed, our decision dismissing ODVN's appeal of the 1990 case when it was unclear whether Ohio Bell would choose to institute the services under the commission's restrictions emphasizes the private

nature of the action. Finding no state action, we find no infringement of appellants' constitutional rights.

## B

### Privacy Rights

Even assuming that the threshold state action requirement were met, appellants' merit arguments would fare no better. In *Smith v. Maryland* (1979), 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220, the Supreme Court held that individuals have no reasonable expectation of privacy in a telephone number, and that Fourth Amendment protections do not extend to the installation and use of a pen register to record numbers dialed from a telephone. The court reasoned:

"Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers harbor any general expectation that the numbers they dial will remain secret. * * * [E]ven if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not 'one that society is prepared to recognize as reasonable'. *Katz v. United States,* 389 U.S. [347] at 361 [88 S.Ct. 507 at 516, 19 L.Ed.2d 576 at 588 (1967) ]." *Id.,* 442 U.S. at 743, 99 S.Ct. at 2581–2582, 61 L.Ed.2d at 228–229 (Harlan, J., concurring).

In *Hamm, supra,* the South Carolina Supreme Court relied on *Smith* in rejecting a similar constitutional challenge to Caller ID ("The telephone number from which a call is placed [when Caller ID is used], like the phone numbers of the calls placed [when a pen register is used], is numerical information passed through the telephone network, voluntarily transmitted as a result of call placement. Caller ID service simply does not violate any right that rises to the level of constitutional protection." *Id.,* 306 S.C. at 78, 409 S.E.2d at 780). We find *Smith* controlling as to appellants' Fourth Amendment claim.[3]

Appellants also argue that the CLASS offerings violate an independent constitutional right against disclosure of personal information, citing *Whalen v. Roe* (1977), 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64. See, also, *Nixon v. Admr. of*

---

3. Appellants also argue that the CLASS offerings violate Section 14, Article I of the Ohio Constitution. We have recognized that this provision is virtually identical to the Fourth Amendment to the federal Constitution and refuse to impose greater restrictions under it. See *State v. Geraldo* (1981), 68 Ohio St.2d 120, 22 O.O.3d 366, 429 N.E.2d 141; *Stone v. Stow* (1992), 64 Ohio St.3d 156, 164, 593 N.E.2d 294, 299–300, at fn. 3.

*Gen. Serv.* (1977), 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. However, implicit in *Smith* and *Hamm* is that the mere numerical information conveyed by telephone users is not "personal information" and does not fall within the ambit of *Whalen's* right against disclosure of personal information, assuming that such right exists. Cf. *J.P. v. DeSanti* (C.A.6, 1981), 653 F.2d 1080, 1089 (*Whalen* created no general right to nondisclosure of private information.).

Moreover, under the balancing test employed in cases that have recognized a general right to informational privacy, we find no constitutional infringement. That test, which traditionally balances the alleged privacy intrusion against the legitimate purpose served by the challenged conduct under an intermediate standard of review, is made more complex in this case, where the privacy interests of both the opponent (calling party) and proponent (call recipient) of the services are affected.[4] In this regard, the calling parties' interests result from the ability to ascertain their identity and location via a disclosed telephone number, which in turn creates the potential for embarrassment, reputational injury, or even physical harm. On the other hand, the call recipients have a legitimate interest in avoiding obscene, threatening, and harassing telephone calls, which the CLASS services are promoted as preventing or deterring.

As to Caller ID, we conclude that the interests served by the service would outweigh the threatened privacy intrusions. Significantly, of those comparatively limited instances in which a caller must make a particularly sensitive or potentially embarrassing call, the free per-call and per-line blocking features would safeguard against disclosure. Indeed, a caller who does not activate that feature would be deemed to consent to the disclosure of the telephone number and, thus, could not assert the privacy interests.

As noted previously, Automatic Callback does not itself disclose the number of the calling party and per-line or per-call blocking is not an option. Rather, disclosure of the calling party's telephone number occurs only through indirect means. For disclosure to occur: (1) the call recipient must subscribe to Automatic Callback; (2) the recipient must activate the callback before another call is received; (3) the recipient must subscribe to a measured local service (which is billed much like long distance calls, *e.g.,* on the basis of number and duration of calls [unlike unlimited flat-rate service] ); and (4) the recipient must request bill detailing (the individual listing of such calls on the recipient's bill).[5] Under these circumstances, considering the comparatively small percentage of calls that would

4. See, generally, Smith, We've Got Your Number! (Is it Constitutional to Give it Out?): Caller Identification Technology and the Right to Informational Privacy (1989), 37 U.C.L.A.L.Rev. 145.

5. Other options to avoid potential disclosure would include placing the call from another phone, including a pay phone, or placing the call with operator assistance.

be subject to disclosure, that even fewer calls would involve embarrassment or potential harm, and that alternative means exist by which to place particularly sensitive calls, we conclude that the interests served by the service outweigh the speculative and remote privacy intrusions.[6]

## III

### *ELECTRONIC COMMUNICATIONS PRIVACY ACT*

Appellants also contend that the CLASS services violate the Electronic Communications Privacy Act ("ECPA"), Chapter 206, Title 18, U.S.Code. Section 3121, Title 18, U.S.Code provides:

"(a) In general.—Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.).

"(b) Exception.—The prohibition of subsection (a) does not apply with respect to the *use* of a pen register or a trap and trace device *by a provider* of electronic or wire communication service—

"(1) relating to the operation, maintenance, and testing of a wire or electronic communication service or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse of service or unlawful use of service; or

"(2) to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, and other provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful or abusive use of service; or

"(3) where the consent of *the user* of that service has been obtained." (Emphasis added.)

The ECPA defines a "pen register" as a "device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached," and a "trap and trace device" as one "which captures the incoming electronic or other

---

6. Appellants also contend that the CLASS offerings violate their privacy rights guaranteed by the First Amendment to the United States Constitution, relying on *NAACP v. Alabama* (1958), 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, and contending that disclosure of their "associations" (*i.e.*, with domestic violence shelters) could result in "reprisals" against domestic violence victims. However, *NAACP* protects " 'freedom of association for the purpose of advancing ideas and airing grievances,' " *Whalen, supra*, 429 U.S. at 604, 97 S.Ct. at 879, 51 L.Ed.2d at 76, fn. 32, quoting *Bates v. Little Rock* (1960), 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480, 485. Appellants have made no such allegation on this record.

impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." Sections 3127(3) and (4), Title 18, U.S.Code. It is not disputed that the CLASS services operate by trapping and tracing the calling party's number. At issue is whether the device is used by the provider (Ohio Bell) under Section 3121(b), Title 18, U.S.Code, and, if so, whether the subscriber to the CLASS service provides the requisite consent under Section 3121(b)(3), Title 18, U.S.Code, as found by the commission.

Appellants rely on *Barasch v. Pennsylvania Pub. Util. Comm.* (1992), 529 Pa. 523, 605 A.2d 1198, in which the Pennsylvania Supreme Court, under state law nearly identical to Section 3121, Title 18, U.S.Code, considered the Caller ID display terminal in the subscribers' possession to be a "trap and trace" device that "captures, displays, and stores for future retrieval the telephone number of the calling party." *Id.* at 531, 605 A.2d at 1201. Other authority reaches the same conclusion[7] that the subscriber is the user, thus prohibiting the service. However, we find the authority to the contrary more persuasive.[8] Specifically, we agree that the Caller ID display unit standing alone is incapable of performing a trap and trace apart from the CCS/SS7 signalling equipment and software necessary to use it, and that it is this equipment that performs the trap and trace. That fact is made even more apparent when considering the trap and trace of calls through Automatic Callback, which operates only via the new signalling technology, and without a display unit.

As to the issue of consent, the *Barasch* court rejected Caller ID under a provision of the Pennsylvania Wiretap Act that required consent to any form of interception to be obtained from all parties. The court found the lack of consent of the calling party to be fatal.[9] *Barasch* is easily distinguishable in that both the federal and Ohio wiretap statutes require only that one party to a communication consent to its interception. See Section 2511(2)(c), Title 18, U.S.Code; R.C. 2933.53(B)(4). See, also, *Hamm, supra.*

---

7. See Congressional Research Service, Caller Identification Telephone Equipment and the Electronic Communications Privacy Act (1989), reprinted in 136 Cong.Rec. E784 (Mar. 22, 1990); North Carolina Dept. of Justice, Memorandum re Caller I.D. Telephone Equipment and Legislation Controlling Trap and Trace Devices (July 17, 1990).

8. See *Hamm, supra;* Rules and Policies Regarding Calling Number Identification Service—Caller ID (NPRM), CC Docket No. 91–281, FCC 94–59 (Mar. 29, 1994), Appendix D (U.S. Dept. of Justice Memorandum—Oct. 23, 1993); 1990 Md.Atty.Gen.Ops. (Oct. 26, 1990) 56.

9. Caller ID was not proposed with blocking, and the court expressly offered no opinion as to the legality of Caller ID with free "per call" blocking. The Pennsylvania legislature subsequently amended its statutes to permit Caller ID if offered with per-call and per-line blocking. See 66 Pa.Cons.Stat.Ann. 2906 (1993).

Finally, OCC relies on an analysis performed by the Congressional Research Service, *supra* (fn. 7), which concluded that the term "the user" in the consent exception, as opposed to "a user," required the consent of a single user to the trap and trace of a particular call, and further suggested that every user of the telephone line over time must consent to the placement of the trap and trace device. This analysis would defeat the general purpose of the exceptions, as recognized by the Congressional Research Service, which was to preserve the legitimate pre-ECPA practices performed by the telephone companies. We find it inconceivable under that practice that consent was obtained from every person who may use a particular line over time (which would make the exception meaningless), or for every particular call (which would be impossible for calls that were unanswered).

We agree with the analysis of the U.S. Department of Justice that "Chapter 206 contemplates that a trap and trace device will be 'attached' to just *one* telephone line [,] *See* 18 U.S.C. §§ 3123(b)(1)(A), (b)(1)(C), (d)(2), 3124(b)[;] * * * that there will be only *one* 'party with respect to whom the installation and use is to take place[,]' Id. § 18 U.S.C. 3124[a], [b] )[;] * * * [and that] the Caller ID subscriber, is thus the 'user' referred to in section 3121(b)(3)." (Emphasis *sic*.) U.S. Dept. of Justice Memorandum, *supra* (fn. 8), at 6.

Accordingly, we affirm the commission's finding that a subscriber, by purchasing the CLASS service, consents to the trap and trace, and thus that such services are not prohibited under the ECPA.

## IV

### RATE INCREASE

Appellants argue that the potential for disclosure of a *non-published* subscriber's number diminishes the level of service to that customer and that, without a concomitant decrease in the charge for a non-published number, such subscribers will suffer an implicit rate increase upon the offerings' approval. In effect, appellants construe the applications for authority to offer *the CLASS services* as applications to increase the rates for *non-published service* under R.C. 4909.18. Appellants request the court to remand these cases to the commission for notice and hearing on this issue under the procedures set forth in R.C. 4909.19 when an application is for an increase in rates. Appellants further request that the commission's orders approving the CLASS offerings be vacated pending the commission's determination on this issue.

Appellants' novel position is without merit. Ohio Bell simply did not propose to *increase the charge for a non-published number*. Although the potential effect of the new offerings on the "value" of existing non-published service may be a basis

to consider the "reasonableness" of the new CLASS offerings, it does not compel notice and hearing under R.C. 4909.18 and 4909.19.

## V

## OCC'S MISCELLANEOUS ARGUMENTS

Finally, OCC seeks remand of these cases to cure three alleged defects in the 1992 and 1993 orders. First, it contends that the commission's order violates R.C. 4903.09 by failing to set forth sufficient findings and reasoning to support its conclusion that Caller ID should be approved with flexible pricing.[10] The commission has traditionally approved flexible pricing only for services it deems to have competitive alternatives. See *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 23 O.O.3d 361, 433 N.E.2d 923; *In re Comm. Investigation into Regulatory Framework for Telecommunication Services in Ohio* (Apr. 9, 1985), PUCO No. 84–944–TP–COI. Although the commission found that Caller ID had no competitive alternatives, it nevertheless approved the flexible pricing structure on the basis that subscription to (and termination of) Caller ID was purely optional. We conclude that the commission's order minimally satisfies the purpose of R.C. 4903.09, which is to provide this court with sufficient details to enable it to determine how the decision was reached. *Gen. Tel. Co. v. Pub. Util. Comm.* (1972), 30 Ohio St.2d 271, 59 O.O.2d 338, 285 N.E.2d 34; *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 270, 527 N.E.2d 777, 781. In that OCC does not contest the reasonableness of the decision, or the general policy of extending the flexible pricing structure to optional, non-basic services, we express no opinion as to that issue. See *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 107, 110, 4 OBR 355, 358, 447 N.E.2d 746, 749, at fn. 5. Noting that the overriding concern of such a policy may be the potential for subsidization of the optional service by basic services, we note that that issue can be reached by way of a complaint and rate mechanisms found in R.C. Title 49.

Second, OCC argues that the initial order and entry on rehearing in the 1990 case bind the commission as to the form of blocking and customer education under which Automatic Callback may be offered. See *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 50–51, 10 OBR 312, 313, 461 N.E.2d 303, 304 ("When the commission has made a lawful order, it is bound by certain institutional constraints to justify that change before such order may be changed or modified."). Under the unique procedural posture of these cases, we are

---

10. Flexible pricing merely sets a minimum and maximum price for the service, and provides the utility with the authority to charge, and change, any price within that range without prior commission approval.

unable to ascribe significant precedential value to the many policy statements made by the commission in the 1990 case, particularly considering that that case merely held that Ohio Bell's applications as proposed were denied, and that Ohio Bell was free to submit revised applications which varied from the commission's suggested modifications. Moreover, having upheld the commission's approval of the services on the merits, we can find no prejudice by the commission's alleged departure from precedent, or any usefulness to be served by remand for further explanation on these issues.

Finally, OCC alleges that the commission improperly relied upon the results of a Harris Poll submitted by Ohio Bell after the close of the evidentiary hearing in the 1990 cases. However, OCC has provided no direct evidence that the commission improperly relied upon the poll, and the commission orders expressly state that it relied solely upon the evidence of record in reaching its determination. We conclude that OCC has failed in its burden on this issue.

For the foregoing reasons, we affirm the commission's order.

*Order affirmed.*

MOYER, C.J., A.W. SWEENEY, DOUGLAS, WRIGHT, RESNICK and F.E. SWEENEY, JJ., concur.

PFEIFER, J., dissents in part and concurs in part.

PFEIFER, J., dissenting in part and concurring in part. I respectfully disagree with the majority's analysis of the automatic callback service.

The approval process at issue in this case constituted "state action" for purposes of constitutional analysis. The United States Supreme Court in *Pub. Util. Comm. of D.C. v. Pollak* (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, required "a sufficiently close relation" between a service being offered and government for there to be state action. *Id.* at 462, 72 S.Ct. at 820, 96 L.Ed. at 1077. Ohio law requires the PUCO to approve the proposed service before it can be offered. R.C. 4909.18. This review and approval process means that a service, while originating in the private sector, is adopted by the PUCO—a state organization. Thus, the plan, when approved by the PUCO, becomes state action.

The violation of privacy rights caused by the automatic callback service outweighs the profitmaking motives of Ohio Bell. Thus, I would find this state action to be unconstitutional. The automatic callback service provides no mechanism for victims of domestic violence to prevent their abusers from participating in this service. Abusers who are called by their victims can obtain their victims' telephone numbers with the use of the automatic callback service. Armed with this number, an abuser could ascertain the location of his victim, which, in turn,

not only threatens his victim with physical harm, but also imperils those who harbor her.

The minimal level of utility derived from the offering of an automatic callback service hardly justifies the haunting that abusers can direct to their victims thanks to this service.