MIGDEN–OSTRANDER, OHIO CONSUMERS' COUNSEL, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

CITY OF MAUMEE ET AL., APPELLANTS, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Migden–Ostrander v. Pub. Util. Comm.,*
102 Ohio St.3d 451, 2004-Ohio-3924.]

(Nos. 2003–0316 and 2003–0332—Submitted January
14, 2004—Decided August 11, 2004.)

O'Donnell, J.

## Background

{¶ 1} The Ohio Consumers' Counsel ("OCC")[1] and the cities of Maumee and Toledo, Ohio, and the Lucas County Board of Commissioners (for ease of reference, the "cities") appeal as of right from orders of the Public Utilities Commission of Ohio issued in a series of commission proceedings filed by Ohio's six investor-owned electric operating companies[2] involving line-extension policies and their implementation.[3]

{¶ 2} The legal backdrop for these appeals is 1999 Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3"), which provides for competition in the supply of electric generation services, commencing January 1, 2001.

{¶ 3} The cornerstone of S.B. 3 was the requirement that three major components of electric service—generation, transmission, and distribution—be unbundled. R.C. 4928.31(A)(1) and 4928.34(A)(1) through (7). Before competition in electric generation services began under S.B. 3, customers received and paid for their electric service on a bundled basis. That is, the three components of electric service were priced as one, and revenues received for the bundled services were used by electric utilities to support their generation, transmission, and distribution investments and expenses.

{¶ 4} With the advent of customer choice of a generator of electricity under S.B. 3, it became necessary for electric utilities to unbundle the three service components and their own components, so that customers could evaluate offers from competitive generators. Unbundling of the service components also ensured that an electric utility would not subsidize the competitive generation

---

1. Robert S. Tongren served as OCC when the notice of appeal in case No. 2003–0316 was filed. Tongren resigned as OCC during the pendency of these appeals; Janine L. Migden–Ostrander is now Consumers' Counsel.

2. The electric companies are the American Electric Power operating companies, Columbus Southern Power Company and Ohio Power Company; the FirstEnergy Corporation operating companies, the Cleveland Electric Illuminating Company, the Toledo Edison Company, and Ohio Edison; and Monongahela Power Company.

3. The proceedings included a commission-ordered investigation, customer complaints, accounting proceedings, charges for cost recovery, and stipulated agreements.

portion of its business by allocating generation expenses to the regulated distribution service provided by the utility. Conversely, it ensured that distribution service would not subsidize the generation portion of the business. In short, each service component was required to stand on its own.

{¶ 5} As stated in R.C. 4928.02(G): "It is the policy of this state to do the following throughout this state beginning on the starting date [4] of competitive retail electric service: * * * (G) *Ensure effective competition* in the provision of retail electric service *by avoiding anticompetitive subsidies* flowing from a noncompetitive retail electric service [e.g., distribution service] to a competitive retail electric service [e.g., generation service] or to a product or service other than retail electric service, *and vice versa.*" (Emphasis and footnote added.) This new regime meant that the cost of providing distribution service could no longer be subsidized by revenues from the generation service component.

{¶ 6} These appeals concern one element of the unbundled distribution component of electric service, i.e., line extensions from existing distribution facilities to serve locations not previously served.

{¶ 7} As part of electric restructuring, S.B. 3 required each electric utility to submit a transition plan and a schedule of rates and charges for commission approval. R.C. 4928.15, 4928.31, and 4928.35. The schedule must state the utility's obligation to build necessary distribution facilities (such as line extensions), but customers requesting service from those facilities "may be required to pay all or part of the reasonable incremental cost of the new facilities, in accordance with rules, policy, precedents, or orders of the commission." R.C. 4928.15(A) and 4928.35(C). The electric companies all filed applications with the commission for approval of their proposed transition plans ("electric transition plans" or "ETPs").

{¶ 8} The transition-plan-approval proceedings all resulted in stipulations and the commission's approval of the stipulations. Those plan-approval proceedings involved tariff filings,[5] including line-extension tariffs, and commission entries approving the tariffs. However, the commission in each entry explicitly stated that it would later consider whether further modification of the line-extension policies was warranted.

{¶ 9} Before retail electric competition began on January 1, 2001, each of the electric companies billed customers based on the actual cost of constructing line extensions, but their tariffs did not contain rates or charges for line extensions.

---

4. January 1, 2001. R.C. 4928.01(A)(28).

5. Public utility tariffs are books or compilations of printed materials filed by public utilities with, and approved by, the commission that contain schedules of rates and charges, rules and regulations, and standards for service.

The electric companies' tariffs after restructuring were similar to their pre–2001 tariffs. None of the tariffs, either before or after restructuring, stated a specific rate or charge for recovery of line-extension costs.

{¶ 10} By midyear 2001, several of the electric companies filed applications with the commission requesting approval of modifications of their line-extension tariffs, requesting authority to defer certain costs, and proposing additional payment options for new customers.

{¶ 11} On October 24, 2001, in response to an increasing number of customer complaints, the commission began investigating past and present line-extension policies to study how they interacted with the commission's own rule governing rural line extensions (Ohio Adm.Code 4901:1–9–07) and to determine whether the postrestructuring line-extension policies and practices complied with S.B. 3.[6]

{¶ 12} On November 21, 2001, FirstEnergy Corporation and the Ohio Home Builders Association filed a joint application[7] requesting commission approval of an agreement resolving a complaint filed by the association[8] over line-extension charges. The application proposed an alternative payment plan for home developers relating to line extensions and further requested accounting authority to effectuate the agreement.

{¶ 13} OCC intervened in the application proceedings and in the commission-ordered investigation. After evidentiary hearings, each of the electric companies filed separate stipulations signed by all parties except OCC and the cities. The commission approved all three stipulations, with modifications. OCC and the cities both filed applications for rehearing, which were denied by the commission on December 19, 2002.

{¶ 14} OCC filed a notice of appeal on February 14, 2003, in case No. 2003–0316, and the cities filed a notice of appeal on February 18, 2003, in case No. 2003–0332. The two appeals were consolidated for purposes of oral argument and decision.

### Introduction

{¶ 15} All but one issue to be considered by this court were raised in the 2002–0316 appeal. An additional issue was raised by the cities in case No. 2003–0332. We will discuss that issue first, followed by discussion of the other issues.

---

6. *In re Comm.'s Investigation into Policies & Procedures of Ohio Power Co., Columbus S. Power Co., Cleveland Elec. Illum. Co., Ohio Edison Co., Toledo Edison Co. & Monongahela Power Co. Regarding Installation of New Line Extensions,* Commission case No. 01–2708–EL–COI.

7. *In re Joint Application of FirstEnergy Corp. & Ohio Home Builders Assn. for Comm. Approval of Agreement Relating to Line Extensions,* case No. 01–3019–EL–UNC (Nov. 21, 2001).

8. *In re Complaint of Ohio Home Builders Assn. & Medina Builders, L.L.C.,* case No. 01–2610–EL–CSS (Oct. 5, 2001).

## Did the commission violate R.C. 4903.09?

{¶ 16} R.C. 4903.09 provides: "In all contested cases heard by the public utilities commission, a complete record of all of the proceedings shall be made, including a transcript of all testimony and of all exhibits, and the commission shall file, with the records of such cases, findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." In their joint notice of appeal in case No. 2002–0332, the cities assert, "The Commission erred by failing to set forth the reasons for its decision in sufficient detail to enable the parties to determine how the Commission reached its decision in violation of R.C. 4903.09."

{¶ 17} The purpose of R.C. 4903.09 is to inform interested parties of the reasons for the commission's action and to provide this court with an adequate record in order to determine whether the decision is lawful and reasonable. As this court observed in *Tongren v. Pub. Util. Comm.* (1999), 85 Ohio St.3d 87, 89, 706 N.E.2d 1255: "Strict compliance with the terms of R.C. 4903.09 is not required. However, a commission order must provide 'in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the PUCO in reaching its conclusion.' [*MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987) ], 32 Ohio St.3d [306] at 312, 513 N.E.2d [337] at 344; *Allnet Communication Serv., Inc. v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 202, 209, 638 N.E.2d 516, 521."

{¶ 18} The cities claim that the commission failed to adequately detail the reasons for its decision and that it failed to present adequate factual or legal authority for its findings. However, the cities misapprehend the standard for this court's review. All that is required is that the commission set forth "some factual basis and reasoning based thereon in reaching its conclusion." *Allnet Communications Serv., Inc. v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 202, 209, 638 N.E.2d 516. See, also, *Ohio Domestic Violence Network v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 311, 323, 638 N.E.2d 1012. Based on our review of the record evidence referred to by the commission, we hold that the commission's orders on appeal meet the tests of adequacy in *Tongren* and *Allnet Communications* and therefore that the commission did not violate R.C. 4903.09.

## Was there a cap on line-extension charges?

{¶ 19} The appellants contend that R.C. 4928.34(A)(6) and 4928.35(A) impose a cap on line-extension charges during the market development period ("MDP").[9]

---

9. The market development period or MDP is a statutorily defined term that, with possible exceptions irrelevant to these appeals, is the period that began with electric competition on January 1, 2001, and ends on December 31, 2005. R.C. 4928.01(A)(17) and 4928.40.

{¶ 20} R.C. 4928.34(A)(6) and 4928.35(A) impose a cap on rates and charges for the unbundled components of electric service for the MDP. Moreover, it is unquestioned that a line extension is a constituent element of the unbundled distribution component of electric service. However, the commission and the electric companies argue that the challenged line-extension charges are not subject to the statutory cap.

{¶ 21} The commission and the electric companies contend that the language in R.C. 4928.15(A) and 4928.35(C) that authorizes the commission to establish line-extension charges [10] provides exceptions to the statutory rate-capping requirements. Indeed, the commission explicitly so concluded in its November 7, 2002 opinion and order. However, OCC accuses the commission of engaging in unnecessary and improper statutory interpretation in reaching this conclusion.

{¶ 22} It was unnecessary for the commission to conclude that R.C. 4928.15(A) and R.C. 4928.35(C) provide exceptions to the statutory rate-capping requirements as to line extensions, because of another explicit ruling of the commission in its November 7, 2002 opinion and order, i.e., the commission's Finding of Fact and Conclusion of Law 10: "The line extension tariffs pre– and post–2001 did not contain any specific rates or charges. They are 'at cost' tariffs. Consequently, there is no rate, bundled or otherwise, to be subject to the adjustment prohibition set forth in Section 4928.35(A), Revised Code."

{¶ 23} Because the General Assembly has invested the commission with the duty and authority to enforce the competition-encouraging statutory scheme of S.B. 3, we acknowledge the commission's expertise in recognizing, establishing, and modifying rates, and accord due deference to the commission's statutory interpretations. *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17–18, 734 N.E.2d 775; *Collinsworth v. W. Elec. Co.* (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071, 1074.

{¶ 24} Based on the foregoing, appellants have failed to demonstrate that the rate caps provided in R.C. 4928.34(A)(6) and 4928.35(A) apply to the electric companies' line-extension charges or that the commission erred in finding otherwise.

### Do the commission-approved stipulations in the ETP approval cases bar increases in line-extension charges?

{¶ 25} The appellants answer this question in the affirmative. They contend that the stipulations entered into by all the electric companies in their respective ETP-approval proceedings provide that distribution rates will not be changed during the MDP or beyond. OCC argues that modification of the electric

---

10. See discussion above at ¶ 7.

companies' line-extension tariffs that had been approved in the ETP stipulations is prohibited in the line-extension proceedings by the doctrine of collateral estoppel, stated as follows: "Collateral estoppel may be applied in a civil action to bar the relitigation of issues already determined by an administrative agency and left unchallenged if the administrative proceeding was judicial in nature and if the parties had an adequate opportunity to litigate their versions of the disputed facts and seek review of any adverse findings." *Tedesco v. Glenbeigh Hosp. of Cleveland, Inc.* (Mar. 16, 1989), Cuyahoga App. No. 54899, 1989 WL 24908. Application of the doctrine of collateral estoppel to the commission's approval of the electric companies' line-extension tariff provisions in the ETP-approval cases might have resulted in finality of those provisions were it not for the fact that the commission conditioned its approval orders on a present and ongoing reservation of the line-extension issue. The commission stated for each of the electric companies, "[A]lthough we are approving provisions in the tariffs regarding line extension policies, the Commission will continue to consider whether further modifications of these policies are warranted." No party to the ETP approval proceedings, including OCC and the cities, sought review of the commission's reservations of further consideration of the electric companies' line-extension policies. Moreover, based on its reservation of further consideration of line-extension policies in the ETP-approval proceedings, the commission specifically stated in its December 19, 2002 entry on rehearing: "The Commission put all parties on notice that the Commission could reconsider the issue of line extension policies. Consequently, we do not agree with OCC that the Commission should disapprove the stipulations based on the doctrine of collateral estoppel."

{¶ 26} We agree with the commission and conclude that it was not barred by collateral estoppel from approving the stipulations below and it did not err in approving them.

### Are the electric companies constrained to recover line-extension costs solely from persons requesting new line-extension facilities?

{¶ 27} OCC argues that only the person requesting electric service in connection with new line-extension facilities may be billed for those facilities. OCC bases this argument on R.C. 4928.15(A) and 4928.35(C).[11] Both of those statutes require that the line-extension tariffs "include an obligation to build distribution facilities when necessary to provide adequate distribution service, provided that a *customer requesting* that service may be required to pay all or part of the reasonable incremental cost of the new facilities, in accordance with rules, policy, precedents, or orders of the commission." OCC argues that because these statutory provisions link a customer's request for distribution service to the

---

11. See discussion above at ¶ 7.

electric utility's obligation to build new facilities, the customer originally requesting service in connection with the new facilities is the only person who may be charged for the line extension. Thus, OCC claims, the commission erred when it approved line-extension tariff stipulations that permit line-extension cost recovery from other persons, such as tenants of landlords, or second or third owners of residences initially owned by persons who requested line extensions.

{¶ 28} We find, however, that OCC's arguments are flawed; they are based on an overly simplistic and narrow reading of R.C. 4928.15(A) and 4928.35(C). The statutes do not restrict the electric companies to recovery of the costs of line-extension facilities exclusively from the customer requesting them, but, rather, from "a customer requesting that service." The service that is requested is not the line-extension service, as OCC contends, but, rather, it is the "adequate *distribution* service," as stated in the statutes. (Emphasis added.) The plain language of the statutes does not limit the responsibility for paying costs of line extensions to customers initially requesting new distribution facilities. Rather, payment of costs is the responsibility of customers who receive distribution service from the new line-extension facilities. The language of the statutes does not require new line facility cost recovery to be from the first customer receiving electric distribution service through those facilities. If it were otherwise, customers subsequent to the first customer requesting new line-extension facilities would receive an unfair free ride, being absolved of any sharing of the cost recovery contrary to the intent of the General Assembly in S.B. 3. See R.C. 4928.35(A). OCC has failed to demonstrate that R.C. 4928.15(A) and 4928.35(C) impose exclusive cost recovery requirements or that the commission erred by approving the line-extension tariff stipulations.

**Did the commission unlawfully approve line-extension tariff stipulations that (1) improperly delegate regulatory power or (2) contain discriminatory provisions in violation of R.C. 4905.33 and 4905.35?**

{¶ 29} OCC claims that the commission abrogated its regulatory duties and responsibilities by approving stipulations that permit the electric companies to contract with private contractors for the construction of line extensions without the commission's prior approval. OCC, however, has not disputed the commission's assertions that (1) the electric companies have always been free to permit customers and developers to perform some of the line-extension work in order to expedite construction and reduce costs and (2) line-extension construction contracts are akin to a myriad of contracts that electric companies enter into for goods and services on a daily basis that are not subject to commission approval.

{¶ 30} OCC relies on R.C. 4905.31(E) as authority for the proposition that for line-extension construction contracts to be valid, they must first be approved by the commission. However, that statute extends the requirement of commission

approval to only five specific categories of contracts, none of which includes construction contracts. For these reasons, OCC's reliance on R.C. 4905.31 in support of this position is misplaced, and this argument is unpersuasive as to the requirement of commission approval.

{¶ 31} OCC also argues that the commission unlawfully and unreasonably approved stipulations incorporating line-extension tariffs that are discriminatory in violation of R.C. 4905.33 and 4905.35. The commission concedes that the tariffs in question allow different charges for different customers. The commission argues, however, that the customers were differently situated and sums up: "[D]ifferences reasonably affecting the expense or difficulty of performing the same or similar service in different areas or circumstances may be reflected in differences in cost recovery rates, and * * * such differences are neither unlawful nor discriminatory. *Buckeye Lake Chamber of Commerce v. Pub. Util. Comm.* (1954), 161 Ohio St. 306, 119 N.E.2d 51." We agree with the commission.

{¶ 32} OCC has failed to establish that the commission-approved line-extension tariff stipulations either resulted in the abrogation of its regulatory contract-approval responsibilities and duties or resulted in discriminatory charges in violation of R.C. 4905.33 and 4905.35.

## Conclusion

{¶ 33} Based on the foregoing, we find that the decisions of the commission were reasonable and lawful, and we therefore affirm the commission in both appeals.

*Orders affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

PFEIFER, J., dissents in part and concurs in part.

---

**PFEIFER, J., dissenting in part and concurring in part.**

{¶ 34} I dissent from the majority's holding that R.C. 4928.34(A)(6) and 4928.35(A) do not impose a cap on line-extension charges during the market-development period. The majority bases its conclusion on previous holdings not of this court, but of the Public Utilities Commission:

{¶ 35} "Because the General Assembly has invested the commission with the duty and authority to enforce the competition-encouraging statutory scheme of S.B. 3, we acknowledge the commission's expertise in recognizing, establishing, and modifying rates, and accord due deference to the commission's statutory interpretations."

{¶ 36} As the only court reviewing the determinations of the commission, we ought to employ our own statutory interpretation. This is especially crucial since, as the majority points out, the commission must in its decisions merely "set forth 'some factual basis and reasoning based thereon in reaching its conclusion.'" Thus, the commission's statutory interpretations can be thin on factual support and analysis. They create an unstable foundation for the development of the law.

{¶ 37} Here, I would hold that since line-extension charges are not within the exception of R.C. 4928.34(A)(6), the cap imposed by R.C. 4928.35(A) applies.

---

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, Jeffrey L. Small and John R. Smart, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

Marsh & McAdams and Sheilah McAdams, for appellant city of Maumee.

Kerry Bruce and Leslie A. Kovacik, for appellant city of Toledo.

Julia R. Bates, Lucas County Prosecuting Attorney, and Lance Keiffer, Assistant Prosecuting Attorney, for appellant Lucas County Board of Commissioners.

Jim Petro, Attorney General, Duane W. Luckey, Werner L. Mergard III, and Thomas McNamee, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Marvin I. Resnick, Edward J. Brady and Porter, Wright, Morris & Arthur L.L.P., Daniel R. Conway, for intervening appellees Columbus Southern Power Company and Ohio Power Company.

James W. Burk and Jones Day, Paul T. Ruxin and Helen L. Liebman, for intervening appellee FirstEnergy Corp.

Gary A. Jack, for intervening appellee Monongahela Power Company.