[Cite as *State v. Crawford*, 2013-Ohio-1659.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No.   98605

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JERMAINE CRAWFORD

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED; REMANDED FOR
CORRECTION OF JOURNAL ENTRY

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-551978

**BEFORE:**   Boyle, J., Stewart, A.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**   April 25, 2013

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, Ohio   44116

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Kevin R. Filiatraut
Assistant County Prosecutor
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Jermaine Crawford, appeals his convictions for felony murder and aggravated robbery. He raises six assignments of error for our review:

1. The trial court erred by denying appellant's motion for a new trial and/or judgment of acquittal.

2. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

3. Appellant's conviction under Count 2 was improper.

4. Appellant was denied a fair trial when the trial court allowed inadmissible evidence in rendering its verdict.

5. The trial court erred by denying appellant's motion to suppress.

6. Appellant's convictions are against the manifest weight of the evidence.

{¶2} Finding no merit to his appeal, we affirm.

Procedural History

{¶3} In July 2011, Crawford was indicted on 12 counts, along with Jadell Vanhorn, James Cassel, and Duan Robinson, for the murder of Navario Banks. The charges against Crawford included: Count 1, aggravated murder in violation of R.C. 2903.01(A); Count 2, aggravated murder in violation of R.C. 2903.01(B); Count 3, aggravated murder in violation of R.C. 2903.01(B); Count 4, aggravated murder in violation of R.C. 2903.01(B); Count 5, aggravated burglary in violation of R.C.

2911.11(A)(1); Count 6, aggravated burglary in violation of R.C. 2911.11(A)(2); Count 7, aggravated robbery in violation of R.C. 2911.01(A)(1); Count 8, aggravated robbery in violation of R.C. 2911.01(A)(3); Counts 9 and 10, kidnapping in violation of R.C. 2905.01(A)(2) and (3); and Counts 11 and 12, having a weapon while under a disability in violation of R.C. 2923.23(A)(2), with a forfeiture specification. The aggravated murder, aggravated burglary, aggravated robbery, and kidnapping counts included one- and three-year firearm, notice of prior conviction, repeat violent offender, and forfeiture specifications. Crawford pleaded not guilty to the indictment.

{¶4} Prior to trial, Crawford moved to suppress all evidence relating to his, his codefendants', and Navario Banks's cell phone records obtained by third-party cell phone companies, and all data obtained from any cell phone. The trial court overruled Crawford's motions on April 19, 2012, after a hearing.

{¶5} Crawford waived his right to a jury trial, and the case was tried to the bench.

## Bench Trial

{¶6} Navario Banks was shot and killed in the back of the head in his Warrensville Heights apartment on March 6, 2011. According to a deputy medical examiner, the shooter firmly pressed the muzzle of a 9 mm gun against the back of Banks's head and pulled the trigger. Banks died instantly. The 9 mm gun that was used to kill Banks was never found.

{¶7} Banks's ex-girlfriend, Cashay Moorer, testified that she was at Banks's apartment during the day on March 6, 2011. Moorer testified that she had broken up with

Banks just before his death because he was a drug dealer. Moorer stated that Banks lived with Christopher Grimes, but Grimes sometimes stayed at his girlfriend's house. Moorer did not recognize photos in court of Robinson, Cassel, or Crawford, but said that she recognized Vanhorn as someone Banks knew through Grimes.

{¶8} On the night Banks was killed, Moorer had spoken to him on the phone that evening. During the last phone call, Banks put her on hold several times to take other calls. Moorer did not know who Banks was talking to on the other line. Banks told her that he had people coming to his house that night. The last time she talked to Banks that night, they were cut off. She tried to call Banks back until about 2:00 a.m. because she did not "trust the people he spoke to." Finally, when she could not reach him, she texted Grimes. She learned the next day that Banks had been killed. Banks's cell phone records confirmed Moorer's testimony that the two had spoken several times that evening.

{¶9} Moorer identified Banks's voice on a 911 call as the voice stating, "I ain't gonna lie to you."

{¶10} Officer Jason Taft of the Warrensville Heights Police Department testified that on March 7, 2011, he was at a gas station in Warrensville Heights when Grimes pulled into the gas station honking his horn. Grimes appeared to be upset. After speaking to Grimes, Officer Taft radioed for other officers to go to Grimes's apartment.

{¶11} Sergeant Michael Ledger testified that he responded to Officer Taft's call. Sergeant Ledger and Officer Sullivan entered the apartment, which had two floors. There was no evidence of a forced entry. He recalled the apartment being "somewhat

disorderly" and "messy." He said that it looked as if it had been "ransacked." They found Banks in an upstairs bedroom, which turned out to be Grimes's room. In both upstairs bedrooms, drawers were open and clothes were "thrown about in a very messy fashion." Sergeant Ledger said police also found both small and large bags of marijuana in the apartment.

{¶12} Detective Dennis Fossett testified that he went to Banks's apartment on March 7, 2011, when he heard the radio broadcast. Detective Fossett explained that he assisted other officers in collecting evidence at the scene. They found "numerous firearms, drug paraphernalia, drugs." They also found "a bag which didn't contain a shotgun, but it had all the paperwork and the documentation in the bag" pertaining to "the Mossberger shotgun." They found marijuana in the closet, "after [they] moved or shifted several items." They also found marijuana under a couch and "under the upstairs steps." He said that the places where they found marijuana were not readily observable. They collected guns from the scene, all found in the west bedroom, and one cell phone. They were able to identify Banks because his wallet was at the scene, but there was no cash in the wallet. They found a 9 mm casing in the east bedroom, where Banks's body was found, but they never found the gun that fired the shot.

{¶13} Early in his investigation, Detective Fossett talked to Moorer, Grimes, and Grimes's girlfriend. Grimes gave Detective Fossett a cell phone that belonged to Banks. As a result of his investigation, Detective Fossett developed the names of four suspects: Robinson, Vanhorn, Cassel, and Crawford. Vanhorn was the first to be arrested on

March 8, 2011. At the time of Vanhorn's arrest, police found a Mossberg shotgun and a "military green" shotgun carrying case in Vanhorn's apartment, which Detective Fossett identified in court.

{¶14} Detective Fossett stated that Cassel was arrested on March 16, 2011, Robinson was arrested on March 23, 2011, and Crawford on June 17, 2011. Robinson gave Detective Fossett a statement when he was arrested.

{¶15} Codefendants Robinson and Cassel testified against Crawford. Prior to Crawford's trial, Robinson and Cassel pleaded guilty to reduced charges of involuntary manslaughter and aggravated robbery. As part of their plea deal, they agreed to testify against Crawford. Robinson and Cassel were sentenced prior to Crawford's trial. At the time of trial, Robinson was serving a six-year prison sentence, and Cassel was serving a four-year prison term.

{¶16} Robinson's and Cassel's testimony regarding the events that occurred on the night of March 6, 2011 — before they got to Banks's apartment — was very similar. Earlier that evening, Crawford and Cassel, who are brothers, borrowed their mother's rented car. But because neither of them had a driver's license, their mother would not let them drive it. Robinson testified that Cassel called him to come over to drive them. Robinson grew up with Cassel, and knew Crawford "from the neighborhood." Robinson drove his own car to Crawford's and Cassel's house, and then drove the rented car when the three of them left. Cassel sat in the front seat beside Robinson; Crawford sat behind Cassel.

{¶17} Robinson and Cassel testified that they intended to purchase marijuana that night. Cassel explained that they were going to look for "kush," which is "a high dose of marijuna." They drove from the east side of Cleveland to the west side to pick up Vanhorn. Both Robinson and Cassel testified that it was Crawford who knew Vanhorn and called him to get directions to Vanhorn's house. Robinson testified that he did not know Vanhorn before then. When Vanhorn got into the car, he sat in the back seat, behind Robinson. Vanhorn gave Robinson directions on how to get to Banks's apartment in Warrensville Heights where they could buy marijuana.

{¶18} But Robinson's and Cassel's testimony differs as to what happened once they got to the apartment. Robinson stated that when they got to Banks's apartment, Vanhorn and Crawford went inside and he and Cassel remained in the car. Robinson testified that he gave Vanhorn $100 to purchase marijuana from someone inside the apartment. Robinson said that he never saw any guns in the vehicle before they got to Banks's apartment. Robinson further stated that Vanhorn and Crawford were not carrying anything when they went into the apartment.

{¶19} After Vanhorn and Crawford went into Banks's apartment, Robinson listened to music and smoked. While waiting for Crawford and Vanhorn to come back to the car, Robinson heard a gunshot. Robinson said that he did not know where Crawford or Vanhorn were when he heard the shot because he was not paying attention. Robinson further testified that he never noticed if Crawford or Vanhorn had anything with them when they got back into the car because he did not look at them when they came out of

the apartment. Robinson could not say how long Vanhorn and Crawford were in the apartment. Vanhorn gave Robinson and Cassel marijuana when he got back into the car, but Vanhorn did not give Crawford any marijuana.

{¶20} Later in Robinson's testimony, he contradicted his earlier statement and said that he did look at Vanhorn when he came out of Banks's apartment and Vanhorn was not carrying anything. But Robinson contradicted that testimony again, stating that when Vanhorn came out of Banks's apartment, Robinson did not see if Vanhorn was carrying anything because Robinson "wasn't looking at him period." Robinson reiterated that he did not look at Crawford either when he came out of Banks's apartment.

{¶21} After they left Banks's apartment in Warrensville Heights, they drove to an apartment at Garden Valley in the Kinsman neighborhood in the city of Cleveland. Robinson testified that he could not remember if he talked to anyone about the gunshot when Crawford and Vanhorn got back in the vehicle. But Robinson stated that Vanhorn said that he shot the person inside the Warrensville Heights apartment.

{¶22} Robinson further testified that when they got to Garden Valley, he got out of the car. The state showed Robinson the Mossberg shotgun in court, and asked Robinson if he had ever seen it. Robinson replied that he had seen it when he got out of the car at Garden Valley. Robinson testified that he never saw the shotgun before that point. Robinson denied that he had ever seen the green shotgun carrying case or any lockboxes. Robinson said that he left after that and walked home from there.

{¶23} Robinson testified that when he was arrested for this case, he spoke with

Detective Fossett. Robinson said that he told Detective Fossett that he "went to purchase marijuana, and that was it." The state asked Robinson if it showed him Detective Fossett's police report from that discussion would it refresh his memory as to what else he told Detective Fossett. Robinson silently read Detective Fossett's police report. The state then asked him if reading the report had refreshed his memory. Robinson responded, "some of it." The state asked, "what did you tell Detective Fossett about what happened?" Robinson replied that he said, "I wanted to go purchase some marijuana. I heard a shot. We left, went to Garden Valley." The state then asked, "did you tell Detective Fossett about a conversation you had with [Crawford] about the gunshot you heard?" Robinson replied, "I didn't specifically ask him. I just asked what happened." The state asked, "what did [Crawford] say?" Robinson responded, "nothing." Robinson further stated that he could not remember anything about the "mood" in the car when the four of them left the Warrensville Heights apartment. Robinson testified that he did not remember Crawford saying anything in the car after they left the apartment.

{¶24} At that point, the state asked the court to declare Robinson a hostile witness, arguing that Robinson agreed to "testify truthfully consistent with the statement he gave to Warrensville Heights police." The state argued that Robinson had reviewed his statement, and said that his memory was only partially refreshed as to what he told the police. Thus, the state argued that Robinson was clearly a hostile witness. Over Crawford's objection, the court allowed the state to treat Robinson as a hostile witness.

{¶25} The state again asked Robinson if he recalled telling Detective Fossett anything about the "mood" in the car. Robinson replied that he did. The state asked, "did people seem happy, sad? How did they seem?" Robinson replied, "nobody wasn't happy." The state asked if Crawford was happy. Robinson replied, "no." The state asked if Crawford said why he was not happy; Robinson replied "no." But upon further questioning, Robinson testified that Crawford asked (he did not explain who Crawford was asking), "why did the person get shot?" Robinson said that was all he could remember. Robinson then agreed that he told police that Crawford was upset because he did not know that Vanhorn was going to shoot the guy.

{¶26} Cassel initially testified that when they got to Banks's apartment, Crawford did not go into the apartment with Vanhorn. It was at that point that the court granted the state's request to treat Cassel as a court's witness and cross-examine him. After conferring with his attorney, Cassel testified that Crawford did go into the apartment with Vanhorn.

{¶27} Cassel explained that Crawford came out of the apartment first, then Cassel heard a gunshot, and then Vanhorn came out of the apartment. Cassel testified that Crawford was near the car when Cassel heard the gunshot. Cassel could not recall if Crawford was carrying anything when he came out of the apartment. The state then asked Cassel if Vanhorn was carrying anything when he came out of the apartment. Cassel replied, "Pretty not too much sure, but when he was in the car, I seen a little black gun hanging out of his pocket and a bag of marijuana."

{¶28} At that point, the court permitted the state to play a videotaped statement that Cassel had given to the state on September 26, 2011, two days before he entered into his plea, to refresh Cassel's memory as to what he previously said he saw Crawford carrying out of Banks's apartment. The court did not listen to Cassel's videotaped statement. After watching the video, Cassel repeatedly denied that he remembered seeing Crawford carry anything out of the apartment. When the state pressed Cassel to say whether his statement was true, Cassel replied, "maybe, maybe not." When further pressed if he was telling the truth in his statement, Cassel responded, "[m]aybe I was, maybe I wasn't." The state then asked, "[w]hy might you have been telling the truth and why might you not have been telling the truth?" Cassel replied, "[b]ecause I was trying to get myself out of the situation I was in." Cassel further testified that the video statement was not accurate, even though it was closer in time to the events than Crawford's trial. Cassel denied that his memory was faulty simply because his brother and other family members were in the room.

{¶29} Cassel testified that when they left Banks's apartment, he thought he heard Vanhorn say that he had shot the guy in the apartment. Cassel also agreed that they were all in the car when Vanhorn said this and that Vanhorn was in the back seat, next to Crawford, when Vanhorn made the statement.

{¶30} Cassel testified that after they left Banks's apartment, they went to a girl's apartment at Garden Valley. Cassel said that he, Crawford, Robinson, and Vanhorn went inside the girl's apartment. When they were in the apartment, Crawford was in the living

room with some girls, while Cassel, Vanhorn, and Robinson were in the kitchen. Once inside the girl's apartment, Vanhorn told Cassel that he would pay him (with marijuana) to open a black lockbox. Cassel walked to his house to get tools to open the lockbox, which he said took about 20 to 25 minutes. When he returned, he opened the lockbox in the kitchen. When he got it open, there were papers inside the box.

{¶31} Cassel testified that he did not know where Vanhorn got the lockbox, but the first time he saw it was when they got out of the car at the Garden Valley apartment, and Vanhorn had it in his hands. Cassel said that when he first saw that Vanhorn had a "tube" (the shotgun case) was also when they got to the Garden Valley apartment. Cassel described the "tube" as having an "army fatigue" color. But Cassel could not identify the gun or the carrying case in court.

{¶32} Cassel later testified that he opened a second lockbox for Vanhorn in the Garden Valley apartment; it was empty. Cassel saw Vanhorn throw the lockboxes in the garbage when they left the Garden Valley apartment. Cassel agreed that all four of them got back in the car, drove to the westside, and dropped Vanhorn off at his house.

{¶33} The state also presented several witnesses, custodians of records of cell phone companies, to authenticate cell phone records that were admitted into evidence over Crawford's objection (although the court did not allow the text messages to be admitted). The cell phone records show that Crawford called Robinson at 7:41 p.m. and 7:42 p.m. on the evening of March 6, 2011, and talked for 49 and 82 seconds respectively. Crawford then called Vanhorn at 8:45 p.m., 8:47 p.m., and 8:49 p.m.,

talking for 34, 33, and 28 seconds. Vanhorn then called Crawford at 8:49 p.m. and 9:17 p.m., for 77 and 35 seconds. Crawford called Vanhorn again at 9:27 p.m., 9:29 p.m., and 9:33 p.m., talking for 34, 52, and 26 seconds. Then, Vanhorn called Crawford at 9:35 p.m., and talked for 52 seconds.

{¶34} The cell phone records also establish that Vanhorn called Banks twice that night, at 10:54 p.m. for 90 seconds and at 11:05 p.m. for six seconds. The records further establish that Banks called 911 at 11:08 p.m. on the night of his death.

{¶35} At the close of the state's case, Crawford moved for a Crim.R. 29 acquittal. The court granted it with respect to Counts 1, 4, 9, and 10, and denied it with respect to all other counts. Crawford then rested.

Verdict and Sentence

{¶36} The court found Crawford guilty of Count 7, aggravated robbery "consisting of theft using a deadly weapon," with the firearm, notice of prior conviction, and repeat violent offender specifications, and the lesser-included offense of Count 3, felony murder, with the same specifications.[1] The court found Crawford not guilty of the remaining counts.

{¶37} At the sentencing hearing, the court found that the two offenses merged, and the state elected to proceed on the murder count. The court sentenced Crawford to 15

---

[1]Count 3 was the lesser-included offense of felony murder based on aggravated robbery. In its journal entry, however, the trial court incorrectly stated that Crawford was guilty of Count 2 (felony murder based on aggravated burglary), and not guilty of Count 3. We find this to be a clerical error and will address it in Crawford's third assignment of error.

years to life for murder, three years for the firearm specifications, and two years for the repeat violent offender specification, for a total of 20 years to life in prison.

**{¶38}** It is from this judgment that Crawford appeals, raising his six assignments of error as stated previously. We will address Crawford's assignments of error out of order for ease of discussion because the outcome of one may necessarily affect the resolution of the others. Specifically, we will address Crawford's evidentiary questions first.

Motion to Suppress

**{¶39}** In his fifth assignment of error, Crawford argues that the trial court erred when it found that he lacked standing to challenge the cell phone records of his codefendants in his motion to suppress, contending that he had a reasonable expectation of privacy in those records because he was a "participant in the conversations." He further argues that the trial court violated his Fourth Amendment rights with respect to his own cell phone records that were improperly obtained from his cell phone service provider without a warrant.

**{¶40}** In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, the Ohio Supreme Court set forth our standard of review:

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts

satisfy the applicable legal standard.

(Citations omitted.)

**{¶41}** At the hearing on Crawford's motion to suppress, Detective Fossett testified as to how he obtained the cell phone records of various persons, including Crawford, Robinson, Vanhorn, and Banks. He explained that in obtaining the cell phone records of Robinson, Vanhorn, and Banks, he contacted the respective cell phone companies, who in turn sent him an "exigent circumstances" request-for-records form. For Crawford, Detective Fossett obtained "a court order" for his cell phone records.

**{¶42}** The Fourth Amendment and the Ohio Constitution, Article I, Section 14, guarantee that individuals be free from unreasonable searches and seizures. Evidence obtained in violation of this guarantee must be excluded from introduction in any criminal trial. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The fruits of such evidence must be excluded as well. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Searches conducted without a probable cause based warrant are per se unreasonable, subject to only a few specifically established and well-defined exceptions. *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

**{¶43}** There are limits, however, on who may assert the right to suppress evidence obtained in violation of the Fourth Amendment. "[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself[.]" *Alderman v. United States*, 394 U.S. 165, 171-172, 89

S.Ct. 961, 22 L.Ed.2d 176 (1969). "Fourth Amendment rights are personal in nature and may not be vicariously asserted by others." *State v. Dennis,* 79 Ohio St.3d 421, 426, 683 N.E.2d 1096 (1997).

> A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.

*Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**{¶44}** Here, the trial court held that Crawford did not have standing to challenge the cell phone records of Robinson, Vanhorn, and Banks. Crawford claims this was error because he had a reasonable expectation of privacy in those records because he was a "participant in the conversations." We disagree.

**{¶45}** For a person to have been aggrieved by an unlawful search or seizure, he or she "'must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.'" *Alderman* at 173, quoting *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Therefore, the trial court was correct that Crawford could not challenge the cell phone records of anyone but his own. *See State v. Young*, 6th Dist. No. H-10-025, 2012-Ohio-1669 (court held that defendant did not have standing to challenge the admission of records obtained from his girlfriend's cell phone).

**{¶46}** Regarding Crawford's challenge to Detective Fossett obtaining his cell phone records from his cell phone service provider, we find that it also lacks merit.

While the contents of "telephone communications" are constitutionally protected (*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), the United States Supreme Court held long ago that a person has no reasonable expectation of privacy in his or her telephone records. *See Smith v. Maryland*, 442 U.S. 735, 61 L.Ed.2d 220, 99 S.Ct. 2577 (1979). The U.S. Supreme Court explained:

> Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers harbor any general expectation that the numbers they dial will remain secret. * * * [E]ven if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not "one that society is prepared to recognize as reasonable." *Katz v. United States*, 389 U.S. [347] at 361 [88 S.Ct. 507 at 516, 19 L.Ed.2d 576 at 588 (1967)].

*Smith* at 743 (Harlan, J., concurring).

{¶47} In *Ohio Domestic Violence Network v. Pub. Util. Comm. of Ohio*, 70 Ohio St.3d 311, 319, 638 N.E.2d 1012 (1994), the Ohio Supreme Court followed *Smith* and held that telephone users have no right of privacy in the numerical information they convey to the telephone company. Courts have also held that this reasoning applies to cell phone records obtained from cell phone companies as well. *See State v. Neely*, 2d Dist. No. 24317, 2012-Ohio-212; *United States v. Dye*, N.D.Ohio No. 1:10CR221, 2011 U.S. Dist. LEXIS 47287 (Apr. 27, 2011).

{¶48} Accordingly, Detective Fossett did not violate Crawford's Fourth Amendment rights by obtaining his cell phone records pursuant to a court order signed by

a judge.    Thus, the trial court did not err when it denied Crawford's motion to suppress. Crawford's fifth assignment of error is overruled.

Inadmissible Evidence

**{¶49}** In his fourth assignment of error, Crawford argues that the trial court improperly allowed inadmissible evidence to be introduced at trial and considered such evidence in reaching its verdict.   The answer to this question will affect the analysis of Crawford's first and second assignments of error, and thus, we will address this assignment before we reach those assignments of error.

**{¶50}** Generally, a trial court enjoys broad discretion in admitting or excluding evidence, and a reviewing court will not reverse that decision absent a finding of abuse of discretion.   *State v. Williams*, 7 Ohio App.3d 160, 454 N.E.2d 1334 (3d Dist.1982), paragraph one of the syllabus.   The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable.   *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144   (1980).   "The term has been defined as 'a view or action that no conscientious judge, acting intelligently, could honestly have taken.'"   *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, _ 130, quoting *State ex rel. Wilms v. Blake*, 144 Ohio St. 619, 624, 60 N.E.2d 308 (1945).

**{¶51}** Crawford first argues that the trial court's admission of Banks's 911 call was improper.   Although Crawford argued at trial that the 911 recording could not be admitted unless it was authenticated, Crawford ultimately stipulated to its admission at

the close of the state's case.   This was invited error, which cannot be raised on appeal. *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359, 626 N.E.2d 950 (1994).

**{¶52}** Next, Crawford raises issues regarding Cassel's statement that he gave to the state prior to entering into his plea.   The trial court ultimately ruled that Cassel's statement was inadmissible, but permitted the state to use Cassel's statement for impeachment purposes.   But Crawford argues that the trial court improperly permitted the state to "reference the contents of [Cassel's] inadmissible proffer statement in arguing for its admission."

**{¶53}** The court granted the state's motion to call Cassel as the court's witness very early in Cassel's testimony (after Cassel initially testified that Crawford did not go into Banks's apartment with Vanhorn).   Evid.R. 614 authorizes the court to call a witness whom a party might otherwise call on the party's "suggestion" that the witness would then recant another prior statement favorable to that party.   *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 43 (2d Dist.), citing *State v. Kiser*, 6th Dist. No. S-03-028, 2005-Ohio-2491.   This rule is set forth in Evid.R. 614(A), which provides: "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."

**{¶54}** "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative damage requirements of Evid.R. 607(A) in order to impeach the witness."   *Id.,* citing *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987). By authorizing the court to call a witness who may then be cross-examined by any party,

Evid.R. 614 creates an exception to the limitation imposed by Evid.R. 607(A), barring a party's impeachment of its own witness with evidence of a prior, inconsistent statement. "[W]here impeachment is a mere subterfuge to get evidence before the [trier of fact] which is not otherwise admissible, impeachment of a party's own witness has been held improper." *Arnold* at ¶ 45, citing 53 A.L.R. Fed. at 500-501.

{¶55} "A trial court possesses the authority in the exercise of sound discretion to call individuals as witnesses of the court." *Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144, paragraph four of the syllabus. A trial court does not abuse its discretion in calling a witness as a court's witness "'when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement[.]'" *Arnold* at ¶ 44, quoting *State v. Schultz*, 11th Dist. No. 2003-L-156, 2005-Ohio-345, ¶ 29.

{¶56} Crawford objected to the court calling Cassel as its own witness because Cassel had already begun testifying. The trial court disagreed, stating that Evid.R. 614 did not limit its discretionary power to a certain time frame. "Call" as a verb is defined in relevant part as "to summon." *Black's Law Dictionary* 232 (9th Ed.2009). Thus, we agree with Crawford that in the traditional sense, to "call" a witness means to summon that witness to testify at the outset. The court clearly did not "summon" Cassel to testify, because the state had called him to testify and he had been already begun testifying when the state requested the court to treat him as a court witness so it could cross-examine him. Nonetheless, we find no abuse of discretion on the part of the trial court when it granted

the state's request to "call" Cassel as the court's own witness. Cassel was certainly "beneficial to ascertaining the truth of the matter," and there was "some indication" that his testimony contradicted a prior statement that he made.

{¶57} Crawford further maintains, however, that granting the state's request to call Cassel as the court's witness permitted the state to bypass the impeachment rules set forth in Evid.R. 607. We disagree, because even if the trial court could not "call" Cassel as its own witness under Evid.R. 614, the state met the requirements under Evid.R. 607(A) to impeach Cassel and cross-examine him.

{¶58} Under the common law rules of evidence, if the prosecutor called a witness, he or she was deemed to have vouched for the witness's credibility and could not thereafter impeach that witness. *Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 at 157. This rule is now set forth in Evid.R. 607, which provides:

> The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803.

{¶59} To establish surprise under Evid.R. 607(A), the state must show that "the testimony is materially inconsistent with the prior written or oral statements and counsel did not have reason to believe that the witness would recant when called to testify." *State v. Holmes*, 30 Ohio St.3d 20, 23, 506 N.E.2d 204 (1987). To show affirmative damage under Evid.R. 607(A), the inconsistent testimony must "contradict, deny, or harm

that party's trial position." *State v. Stearns*, 7 Ohio App.3d 11, 15, 454 N.E.2d 139 (8th Dist.1982).

{¶60} The transcript reveals that the state was clearly surprised when Cassel initially testified that Crawford did not go into Banks's apartment with Vanhorn. This testimony also establishes that the state was "affirmatively damaged" because Cassel contradicted his prior statement regarding a fact material to the state's case. Further, Cassel entered into a plea bargain with the state and received a significantly lesser sentence than he might have otherwise in the absence of his cooperation. The state manifestly expected when it called Cassel as a witness, that he would testify in accordance with his prior version of the facts that had won him a favorable plea bargain. Therefore, the trial court could have permitted the state to impeach its own witness under Evid.R. 607(A), even if it had not done so under Evid.R. 614. Accordingly, we conclude that the trial court did not err in allowing the state to "reference" the statement that Cassel had previously made to impeach his credibility.

{¶61} Crawford further argues that the trial court — as the trier of fact — inadvertently considered Cassel's statement as substantive evidence of Crawford's guilt because "the proffer was the only thing that allegedly suggested [Crawford] had any connection to a lockbox." Appellate courts, however, presume that a trial court only considered relevant and admissible evidence in a bench trial. *See State v. Chandler*, 8th Dist. No. 81817, 2003-Ohio-6037, ¶ 17, citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). When the trial court is the trier of fact, the judge is presumed

capable of disregarding improper hearsay evidence, and unless it is demonstrated that the court relied on inadmissible hearsay, a conviction will not be reversed. *In re Sims*, 13 Ohio App.3d 37, 41, 468 N.E.2d 111 (12th Dist.1983). Crawford has not demonstrated here that the trial court relied on inadmissible hearsay. Indeed, the trial court indicated several times that it could not — and would not — consider Cassel's statement for any purpose.

{¶62} Finally, Crawford maintains that the trial court erred when it admitted his cell phone records, his codefendants' cell phone records, and Banks's cell phone records. In this argument, he concedes that the state properly authenticated the cell phone records, but he maintains that admission of these records violated his Fourth Amendment rights. In doing so, he incorporates the arguments he made in his fifth assignment of error, which we have already overruled.

{¶63} Accordingly, we find no error on the part of the trial court with respect to Crawford's evidentiary arguments. Crawford's fourth assignment of error is overruled.

### Sufficiency of the Evidence

{¶64} In his second assignment of error, Crawford argues (1) that there is no evidence in this case that he participated in the robbery or murder of Navario Banks, (2) that there is no evidence that he assisted in carrying anything out of the apartment, (3) that there is no evidence that he knew anyone had a gun when they went to Banks's apartment, and (4) that there was no physical or forensic evidence tying him to the crimes.

Based on this "lack of evidence," he claims that his convictions were not supported by sufficient evidence.

{¶65} When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶66} Thus, the state had to present sufficient evidence on the elements of aggravated robbery and felony murder, such that the trier of fact could find Crawford guilty of each offense beyond a reasonable doubt.

{¶67} Aggravated robbery under R.C. 2911.01(A)(1) states that

[n]o person, in attempting or committing a theft offense * * *, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

{¶68} Felony murder under R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

{¶69} In this case, the state argued that Crawford was guilty of aggravated robbery and felony murder on the theory of complicity. Thus, under R.C. 2923.03(A)(2), the state also had to present sufficient evidence that Crawford acted "with the kind of

culpability required for the commission of an offense" by aiding or abetting another in committing the offense.

{¶70} In order to prove complicity by aiding and abetting, the state had to prove beyond a reasonable doubt "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The criminal intent of the aider and abettor "can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, citing *Johnson* at 245. Although presence at the scene of the crime by itself is not sufficient evidence of complicity, "[t]his rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.* at 243. As with proof of any element of an offense, complicity may be proved by circumstantial evidence, which has the same probative value as direct evidence. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus.

{¶71} After reviewing the evidence at trial, we conclude that the state presented sufficient evidence that, if believed, establishes beyond a reasonable doubt that Crawford aided and abetted Vanhorn in the aggravated robbery of Banks, and that Banks's death was the proximate result of that robbery.

{¶72} Viewing the evidence in a light most favorable to the state, it presented evidence, albeit circumstantially, establishing that Crawford aided and abetted Vanhorn in robbing Banks. Through Robinson's and Cassel's testimony, the state established that it was Crawford who knew Vanhorn. Crawford and Vanhorn spoke several times on their cell phones prior to getting together that night. It was Crawford who gave directions to Robinson on how to get to Vanhorn's house. Vanhorn called Banks and spoke to him twice, minutes before Banks called 911.

{¶73} The evidence further establishes that Crawford and Vanhorn went into Banks's apartment together. Vanhorn shot Banks while he was in the apartment. Whether Crawford was inside or outside of Banks's apartment when Vanhorn shot Banks is irrelevant (Robinson said he was inside; Cassel said he was not) for purposes of felony murder because Banks died as a result of the aggravated robbery that Crawford aided and abetted Vanhorn in committing.

{¶74} Crawford, Cassel, and Robinson remained with Vanhorn in the car after he announced that he shot Banks. This fact, along with the facts that occurred prior to the robbery and murder of Banks, helps establish that the acts were part of the plan to rob Banks. As we previously stated, the criminal intent of the aider and abettor "can be inferred from the presence, companionship, and conduct of the defendant *before and after* the offense is committed." (Emphasis added.) *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, citing *Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796.

**{¶75}** The evidence, if believed, also shows that someone, either Crawford or Vanhorn, carried two lockboxes and a green shotgun case (that had a Mossberg shotgun inside of it) out of Banks's apartment. One can infer this circumstantially because when the four men got to the Garden Valley apartment, Vanhorn had these items in his possession. According to Cassel and Robinson, these items were not in the vehicle prior to going to Banks's apartment.

**{¶76}** Further, Vanhorn got marijuana from Banks's apartment as well because he gave it to Robinson and Cassel when he got back to the car. Although Robinson said that he gave Vanhorn $100 to buy him marijuana, police did not find any money in Banks's apartment. Thus, one can infer that Vanhorn stole marijuana from Banks as well, even though it was established that the robbers did not take all of the marijuana that was in Banks's apartment. Detective Fossett testified that the large amounts of marijuana found in Banks's apartment were not in plain view; police had to search to find them.

**{¶77}** Thus, viewing all of the evidence in a light most favorable to the state, we find that it presented sufficient evidence to establish that Crawford aided and abetted Vanhorn in robbing Banks. Because Banks died as a result of the commission of the aggravated robbery, the state also presented sufficient evidence that Crawford committed felony murder by complicity.

**{¶78}** Crawford's second assignment of error is overruled.

<u>Felony Murder under Count 2 or Count 3</u>

**{¶79}** In his third assignment of error, Crawford argues that his felony murder conviction under Count 2 as stated in his sentencing journal entry is improper because felony murder under Count 2 is based on the underlying offense of aggravated burglary, of which the trial court found him not guilty.[2]

**{¶80}** When the trial court gave its verdict, it found Crawford not guilty of all counts, except aggravated robbery under Count 7, and felony murder based on the underlying offense of aggravated robbery, Count 3. But in sentencing Crawford, the trial court mistakenly said that it had previously found Crawford guilty of Count 2 (which was based on aggravated burglary) instead of the correct felony murder count based on aggravated robbery, which was Count 3.

**{¶81}** We find this to be a clerical error that the trial court can correct upon remand. Accordingly, we overrule Crawford's third assignment of error, but remand for the trial court to correct its clerical error and state that it found Crawford guilty of Count 3 felony murder and not guilty of Count 2 felony murder.

<u>Motion for a New Trial</u>

---

[2]R.C. 2911.11, aggravated burglary, provides in relevant part:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."

{¶82} In his first assignment of error, Crawford argues that the trial court erred when it denied his motion for a new trial.

{¶83} In his motion, Crawford argued that he should be granted a new trial under Crim.R. 33(A)(1) and (A)(4). Crim.R. 33(A) provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

> (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
>
> * * *
>
> (4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified[.]

{¶84} The standard applied when reviewing a trial court's determination on a motion for a new trial is that of abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus.

{¶85} Under Crim.R. 33(A)(4), a new trial court may be granted if the verdict is not sustained by sufficient evidence. Because we have already found that his convictions were indeed supported by sufficient evidence, we need not address this issue again.

{¶86} Crawford further argued that there were procedural irregularities that materially affected his substantial rights, such that he should have been granted a new

trial.    The procedural irregularities that he raised are (1) that the trial court changed its verdict; (2) that the court never found him guilty of the various specifications contained in Count 7; and (3) that the court found him guilty of Count 3 without specifying that it was a lesser-included offense.    We find no merit to any of these arguments.

{¶87} After making findings of fact, the trial court stated that it found Crawford guilty of aggravated robbery, but not guilty of all other counts.    The trial court then asked the state and defense counsel if there were any comments.    The state reminded the court that it had asked the court to consider "the lesser count of murder B wherein the only thing [the state] would need to prove is the defendant's purpose to commit an aggravated robbery during the course of which Navario Banks was killed."

{¶88} The court agreed, stating:

> I believe, perhaps, in that respect the state is correct that murder B, since that does not require a purpose but merely an offense of violence — commission of an offense of violence, that the defendant would be guilty of Count 2 — Count 3.    Excuse me.    Count 3.    So that would be Count 3 and Count 7, guilty.    Not guilty of the remaining charges.

{¶89} The court then clarified that it meant Count 3 as the lesser-included offense.  The court further clarified that "in both cases," it found Crawford guilty of the two counts with the firearm, notice of prior conviction, and repeat violent offender specifications.    The state withdrew the forfeiture specification because the Mossberg shotgun had already been forfeited in Vanhorn's case.

{¶90} After reviewing the record, we find that the trial court did not abuse its discretion in denying Crawford's motion for a new trial.    In its "memorandum of opinion

and order" on Crawford's motion, the trial court agreed that it had "inadvertently failed to use the language of a 'finding' of guilt of the NPC, RVO, and firearm specifications," but said that "a review of the transcript makes it clear that that was the court's intention."

**{¶91}** In its "memorandum of opinion and order," the trial court also acknowledged that it originally found Crawford guilty of only aggravated robbery under Count 7. The court specifically noted that its change "did not reflect a rethinking as to what the evidence had proved." But rather, that it had "inadvertently failed to consider the lesser included offense" in its deliberations. It then stated, "guilt as to murder R.C. 2903.02(B), follows logically from the evidence before the court."

**{¶92}** The trial court further explained that Crim.R. 31, which explicitly sets forth what is required of a jury verdict, is silent as to what is required in a bench trial. The court, therefore, found no procedural irregularities in its verdict.

**{¶93}** We agree with the trial court's well-reasoned opinion in denying Crawford's motion for a new trial, and find no abuse of discretion.

**{¶94}** Crawford's first assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

**{¶95}** In his final assignment of error, Crawford maintains that his convictions were against the manifest weight of the evidence.

**{¶96}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. When reviewing a claim challenging the manifest weight of the

evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). After reviewing the entire record, the reviewing court

> must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

**{¶97}** Crawford argues that his convictions were based solely on the unreliable testimony of his codefendants, Robinson and Cassel. Especially when, as he points out, there was no physical evidence or forensic evidence tying him to the crimes.

**{¶98}** We agree with Crawford that Robinson's and Cassel's (Crawford's brother) testimony — especially Cassel's — was severely compromised. It was clear from the transcript that neither witness wanted to testify against Crawford. Their answers were evasive and contradictory. It is also true that there was no physical or forensic evidence tying Crawford to the crimes.

**{¶99}** Nonetheless, there was substantial testimonial and circumstantial evidence existing to justify the trier of fact's verdict. Through the cell phone records, Detective Fossett's testimony, Moorer's testimony, and even Cassel's and Robinson's, the state was able to circumstantially piece together the events that occurred on the evening of March 6, 2011.

{¶100} Crawford argues that, at most, the evidence only establishes that he called Vanhorn because Vanhorn is the one who knew where to get the high dose of marijuana ("kush") for his brother and Robinson. Thus, Crawford maintains that he was only complicit in buying marijuana. We disagree.

{¶101} Viewing the evidence presented by the state as a whole and sitting as the "thirteenth juror," we find that the state met its burden of persuasion establishing that Crawford aided and abetted Vanhorn in the robbery of Banks. From the beginning of the evening, when Crawford and Vanhorn spoke on their cell phones several times, to driving to the westside to pick Vanhorn up at his house, driving back to the eastside to go to Banks's apartment, going into the apartment together, Vanhorn shooting Banks, leaving Banks's apartment, Vanhorn telling Crawford, Robinson, and Cassel that he shot Banks, the four continuing on together to an apartment at Garden Valley, and finally, ending up with the marijuana, the Mossberg shotgun, and two lockboxes taken from Banks's house, the state met its burden of persuasion. It is clear that the aggravated robbery — in which Crawford was complicit — resulted in Banks's death, even if Crawford did not know (as he claims) that Vanhorn was going to shoot Banks. Based on this evidence, we find that this is not such the case where the evidence weighs heavily against Crawford's convictions.

{¶102} Moreover, although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v.*

*Bradley*, 8th Dist. No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶103} Accordingly, after reviewing the entire record and weighing the evidence and all reasonable inferences, including the credibility of the witnesses, we cannot say that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶104} Crawford's sixth assignment of error is overruled.

{¶105} Judgment affirmed. Case remanded for correction of a clerical error in the sentencing journal entry to accurately reflect that Crawford was found guilty of felony murder under Count 3, and found not guilty of felony murder under Count 2.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

MELODY J. STEWART, A.J., and
MARY EILEEN KILBANE, J., CONCUR